UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
GAMEL A. CHERRY,                                  :
                                                  :
                                 Petitioner,      :
                                                  :     MEMORANDUM
                                                  :     AND ORDER
                    - against -                   :
                                                  :     09-CV-1452 (JG)
JAMES WALSH,                                       :
                                                  :
                                 Respondent.   :
------------------------------------------------------------- X

A P P E A R A N C E S:

        GAMEL A. CHERRY,
                # 03A4235
                Sullivan Correctional Center
                P.O. Box 116
                Fallsburg, NY 12733-0116
                Petitioner, *pro se*

        CHARLES J. HYNES
                District Attorney
                Kings County
                350 Jay Street
                Brooklyn, NY 11201
        By:     Ann Bordley
                Leonard Joblove
                Attorneys for Respondent


JOHN GLEESON, United States District Judge:

        Gamel A. Cherry, a prisoner incarcerated in the Sullivan Correctional Center,

petitions for a writ of habeas corpus under 28 U.S.C. § 2254, seeking relief from a judgment of

the New York State Supreme Court, Kings County.  After a jury trial, Cherry was convicted of

first degree felony assault for opening fire on two undercover police detectives.  Appearing *pro*

*se*, Cherry contends primarily that his conviction was based on an impermissibly suggestive

lineup. He also challenges the sufficiency of the evidence that any assault was committed "in furtherance of" criminal possession of a weapon, as required for the jury to convict him of felony assault. Oral argument, at which Cherry appeared by teleconference, was held on August 21, 2009. For the reasons set forth below, the petition is denied.

## BACKGROUND

A.     *The Offense Conduct*

Cherry's conviction resulted from a gun buy-and-bust that went wrong. Detective John Robert, an officer assigned to the NYPD's Firearms Investigation Unit, was introduced by a confidential informant to Edward Moultrie. Posing as a buyer from Manhattan, Robert agreed with Moultrie by telephone to purchase four semi-automatic guns for $3,000. The two agreed to meet on the evening of May 22, 2002 outside Junior's Restaurant in Downtown Brooklyn, at the corner of Flatbush Avenue and DeKalb Avenue.

Neither arrived at the appointed meeting place alone; Robert was accompanied by his partner, Detective Arthur Marquez, while Moultrie brought Kevin Langston. Neither Moultrie nor Langston had the guns, but Langston said they were nearby. Langston and Moultrie got into the detectives' car, and Robert drove the four men further into Brooklyn at Langston's direction. On the way, the four discussed, among other things, Junior's famous cheesecake. Tr. 690.[1]

---

[1]     Throughout this opinion, "Tr." refers to the trial transcript. Additionally, numbers preceded by "H" refer to the transcript of the pre-trial suppression hearing, numbers preceded by "HH" refer to the transcript of the post-trial suppression hearing on June 20, 2006, and numbers preceded by "HHH" refer to the transcript of the continued post-trial hearing on September 12 and 21, 2006.

After fifteen minutes or so, Langston told Robert to stop the car opposite the entrance to a residential building at 301 Sutter Avenue in Brownsville.  Tr. 552. Langston then said: "Okay, give me the money, I'll be right back."  *Id.*  Robert replied: "Go get the guns, bring them down here, and after we look at them, I'll give you the money."  Tr. 553.  Langston, unhappy with this answer, again proposed that he take the money and return with the guns.  *Id.* Again, hoping to make a firearms case, Robert refused to part with any money before seeing the weapons.  Langston then entered the building, leaving the other three men outside.

Langston, it appears, had no intention of consummating a bilateral commercial transaction.  On home turf deep in the heart of Brooklyn, he and his associates apparently thought they could get something for nothing from these putative buyers from Manhattan.  After emerging from the building, Langston again demanded the money up front, claiming that he would soon return with the guns.  This, he said, was the way things worked in Brooklyn.  For the third time, Robert refused to hand over any cash without seeing the weapons.

Langston then proposed that the exchange take place inside the building.  Tr. 559. Along with Moultrie, he took the undercover detectives indoors, and brought them up to the sixth floor hallway.  Despite his prior assurances, Langston refused to produce the merchandise without cash in hand.  And yet again, the detectives declined to part with the money in those circumstances.  Tr. 562.  Frustrated, Langston left the hallway ostensibly to discuss the matter with others, only to return with the same stale proposal.

At this point, Cherry appeared from the stairwell.  He sang a familiar tune: "This is how we do business here, just give us the money, we're going to go right downstairs and come right back with the guns."  Tr. 567.  True to form, the detectives demurred.  Cherry then asked the detectives for identification; Marquez produced a fake driver's license.  After inspecting the

license, Cherry said: "Okay, we're going to do this, you are going to get what you came here for." Tr. 571. Cherry went back into the stairwell.

About five minutes later, three men emerged from the stairwell. The detectives later identified these three men as Cherry, Ralph Wyman and Skyler Brownlee. All three were armed, and each opened fire on the undercover detectives. The supposed sellers, it appears, had decided give up the pretense, and tried to rob the buyers in a more forthright fashion. The detectives, however, returned fire, and fled the building when the shooting stopped. Marquez was shot in his left hand, and ultimately retired from the NYPD as a result of the injury. Langston, Wyman, Moultrie, and Leonard Barber also sustained gunshot wounds. Moultrie's injuries left him paralyzed from the waist down.

B.     *The Investigation and Lineup*

Detective Leonard Cocco of the 73rd Precinct Detective Squad was assigned to investigate the case. Cherry became a suspect early in the investigation when Brownlee named "Mel-Mel" as one of the people involved in the shooting and identified Cherry as "Mel-Mel" from a photograph. H. 36-37, 54-56. Cocco disseminated "wanted" posters of Cherry to police precincts throughout north Brooklyn and Queens. H. 96. Additionally, at Cocco's behest, Cherry's picture was published in a newspaper in late May or early June. H. 104-05.

On June 28, thirty-seven days after the shooting, Cherry was arrested by Cocco at a hotel in Queens and taken to the 73rd Precinct. Tr. 875-76. There, Robert and Marquez each picked Cherry from a lineup as one of the men who had opened fire on May 22. Tr. 582, 729.

C.      *Procedural History*

        1.      *The Trial Proceedings*

        Cherry was charged in New York Supreme Court, Kings County, with attempted murder (two counts), assault in the first degree (two counts), criminal possession of a weapon in the second and third degrees, and criminal sale of a firearm in the third degree.  Cherry entered a plea of not guilty to all the charges.  Cherry and Langston were tried jointly with separate juries.

        Before the trial, Cherry moved to suppress the undercover detectives' identification testimony, contending that the detectives must have seen Cherry's picture before the lineup, and that the lineup was therefore unduly suggestive and violated his right to due process.  The trial judge, Justice Gerges, conducted a *Wade* hearing before ruling on the motion to suppress.  *See Wade v. United States*, 388 U.S. 218 (1967).  On cross-examination, Detective Cocco testified that the poster of Cherry was distributed widely in the period between the shooting and the lineups, and conceded that he had seen Detectives Robert and Marquez during the course of the investigation.  H. 96, 99.  Cocco denied, however, that he had ever shown either of the undercover detectives a picture of Cherry.  H. 104.  He also stated that, before the lineup, he ensured that no posters of Cherry were on display in the 73rd Precinct.  H. 105.

        In light of Cocco's testimony, Cherry's counsel asked the court for permission to call Detectives Robert and Marquez to inquire whether either saw a photograph of Cherry before the lineup.  H. 147.  New York law grants defendants only a limited right to call witness at a *Wade* hearing.  *See People v. Chipp*, 75 N.Y.2d 327, 337 (1990) ("any right of compulsory process at a hearing may be outweighed by countervailing policy concerns, properly within the discretion and control of the hearing Judge").  When considering the request, the trial judge therefore asked for specific evidence that the undercover detectives had seen photographs of

5

Cherry, to which Cherry's counsel responded: "[C]ommon sense tells me that if those photographs were out, that they were involved in this particular case, nobody told them not to look at those photographs, that being human beings that they probably looked at the photographs." H. 156. The trial judge deemed this line of inquiry "speculative," and denied Cherry's counsel the opportunity to call the detectives on that basis. H. 148.

The hearing court then denied Cherry's motion to suppress the identification testimony, concluding that "[t]he identification procedures conducted here were in accordance with constitutional mandates." H. 215-16.

At trial, Cherry's counsel admitted that Cherry was present at 301 Sutter Avenue, and had participated in the failed attempts to trick Robert and Marquez into handing over the money, but claimed that Cherry left the scene before the shooting started. Tr. 1162-63. The undercover detectives, however, testified that Cherry was one of the shooters, and that they had each picked him out of a lineup.

On July 29, 2003, the jury acquitted Cherry of the attempted murder charges and found him guilty of felony assault in the first degree.[2] The trial court adjudicated Cherry a second violent felony offender and sentenced him to twenty-five years in prison.

2.     *The Appeal and Second Suppression Hearing*

Cherry appealed from the judgment of conviction to the Appellate Division, Second Department. He raised two claims: (1) that the trial court's refusal to allow him to call Detectives Robert and Marquez at the *Wade* hearing denied him his constitutional right to present relevant evidence, an error he said warranted a new trial; and (2) that the evidence at trial

---

[2]     The judge submitted only one of the first-degree assault charges -- the felony assault charge -- to the jury. Additionally, the jury did not return a verdict on the weapons counts, having been instructed by the judge not to do so if it found Cherry guilty of assault. Tr. 1237.

was legally insufficient to convict him of felony assault, because the evidence did not establish that the shooting occurred "in the course of and in furtherance" of a felony. *See* N.Y. Pen. Law § 120.10(4) (McKinney 2002). Cherry conceded that he had not raised the second of these arguments before the trial court.

The Appellate Division accepted Cherry's first argument, finding that the hearing court erred when it denied Cherry the opportunity to call Robert and Marquez at the suppression hearing. *People v. Cherry*, 812 N.Y.S.2d 550, 552 (2d Dep't 2006). Because Detective Cocco's testimony "left open the possibility" that identification testimony was based upon previously-viewed photographs, there was a "substantial issue as to the constitutionality of the identification procedures," such that Cherry should have been allowed to call the detectives. *Id.* The appellate court held the appeal in abeyance and sent the case back to the Supreme Court for a *de novo* post-trial suppression hearing, "at which the defendant may call the appropriate witnesses to determine the illegality, if any, of the witnesses' identifications and for a report thereafter." *Id.*

In June and September of 2006, Justice Gerges conducted a new *Wade* hearing as directed by the Appellate Division. Robert and Marquez testified that they saw no photographs or posters of Cherry between the shootout and the lineup. HH. 7; HHH. 8-9. The hearing court credited the detectives' testimony, concluded that the lineup was not impermissibly suggestive, and again denied Cherry's motion to suppress their identification testimony.

In light of the hearing court's post-trial decision, the Appellate Division then affirmed the judgment of conviction. *People v. Cherry*, 848 N.Y.S.2d 283 (2d Dep't 2007). Deferring to the lower court's determination of credibility, the Appellate Division concluded that the detectives' testimony was "neither incredible nor patently tailored to nullify constitutional objections." *Id.* at 284. As to Cherry's insufficiency claim, the Appellate Division stated that

"[t]he defendant's remaining contention is unpreserved for appellate review and, in any event, without merit." *Id.*

A judge of the New York Court of Appeals denied Cherry's application for leave to appeal to that court on April 16, 2008. *People v. Cherry*, 10 N.Y.3d 839 (2008) (Ciparick, J.).

3.   *This Petition*

On April 6, 2009, Cherry filed this petition for habeas corpus. He contends that his conviction should be vacated on three grounds: (1) that the trial court erred in refusing to allow him to call the detectives at the initial suppression hearing; (2) that the trial court should have suppressed the detectives' identification testimony because it was tainted by an impermissibly suggestive lineup; and (3) that the evidence at trial was legally insufficient to establish that the assault was committed "in furtherance of" criminal possession of a weapon.


DISCUSSION

A.   *Standards of Review*

1.   *Review of State Court Adjudications under AEDPA*

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal habeas court may overturn a state court's ruling on the merits of a claim only if the state decision was "contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state decides a case differently than [the Supreme Court] has on a set of materially

indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A decision is "an unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* at 413. An unreasonable application is more incorrect than a merely erroneous one, *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (citing *Williams*, 529 U.S. at 411), but while "[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence," *Gilchrist*, 260 F.3d at 93 (internal quotation marks omitted).

In addition, AEDPA contains two provisions mandating deference to state-court findings of fact. First, habeas relief may not be granted based on a claim adjudicated on the merits in state court unless the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in a State court proceeding." 28 U.S.C. § 2254(d)(2). In addition, a state court's finding on a discrete factual issue is presumed to be correct, and the petitioner bears the burden of "rebutting the presumption of correctness by clear and convincing evidence." *Id.* § 2254(e)(1).

AEDPA's limited scope of review applies whenever a state court disposes of a state prisoner's federal claim on the merits and reduces its disposition to judgment, regardless of whether it explicitly refers to federal law in its decision. *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001).

2. *Procedural Default*

A claim that has been procedurally defaulted in state court generally cannot be reviewed on the merits by a federal habeas court. *See Harris v. Reed*, 489 U.S. 255, 260-62

(1989) (explaining rationale for habeas corpus procedural default rule); *see also Coleman v. Thompson*, 501 U.S. 722, 750 (1991) (noting a state's interest in "channeling the resolution of claims to the most appropriate forum, in finality, and in having an opportunity to correct its own errors"). A state court's reliance on petitioner's failure to comply with a procedural rule normally constitutes an independent and adequate state law ground for rejecting the claim, to which the federal courts usually defer as a matter of federalism and comity.[3] *Id.* at 730-32. However, there are two circumstances in which a federal claim that has been procedurally defaulted may nevertheless receive federal habeas review.

First, a petitioner is entitled to review of a procedurally defaulted claim if he can show "cause for the default and actual prejudice as a result of the alleged violation of federal law." *Coleman*, 501 U.S. at 750; *Teague v. Lane*, 489 U.S. 288, 298 (1989). A petitioner may establish cause by showing "that the factual or legal basis for a claim was not reasonably available to counsel, . . . or that some interference by officials . . . made compliance impracticable." *Coleman*, 501 U.S. at 753 (internal quotation marks omitted). To show prejudice, a petitioner must demonstrate that the alleged error worked to his "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Torres v. Senkowski*, 316 F.3d 147, 152 (2d Cir. 2003) (internal quotation marks omitted).

Second, if the petitioner is unable to show cause and prejudice, his procedural default may nonetheless be excused if he or she can show that a fundamental miscarriage of justice would result from a failure to hear the claim on the merits, i.e., "that he is actually innocent of the crime for which he has been convicted." *Dunham v. Travis*, 313 F.3d 724, 730

---

[3]     A procedural bar relied on by a state court to dispose of a claim may be found inadequate to prevent federal review on rare occasions where the state court applies the procedural bar in an "exorbitant" manner. *Lee v. Kemna*, 534 U.S. 362, 376 (2002); *see also Cotto v. Herbert*, 331 F.3d 217, 239 (2d Cir. 2003).

(2d Cir. 2002) (citing *Schlup v. Delo*, 513 U.S. 298, 321 (1995)).  This ground for excusing

procedural default should be invoked only in "extraordinary" cases, as courts deem substantial

claims of actual innocence "extremely rare."  *Schlup*, 513 U.S. at 321-22.

B.      *Cherry's Claims*

        1.      *The Right to Call Witnesses at the Suppression Hearing*

                Cherry's first ground for challenging his conviction is his claim that he was

denied his constitutional right to due process when the hearing court refused his request to call

Detectives Robert and Marquez at the pretrial *Wade* hearing.  The government responds that this

claim is moot, because the Appellate Division later accepted that it was error to deny Cherry the

right to call the undercover detectives, and gave him the opportunity to cross-examine them at

the post-trial suppression hearing.

                Certainly, if Cherry's claim is moot, it provides no basis for setting aside his

conviction.  *See, e.g., Jones v. Walsh*, No. 08-CV-915 (JG), 2008 WL 2064555, at *6 (E.D.N.Y.

May 12, 2008) (defendant's claim of error was moot because Appellate Division had remedied

any error).  Cherry points out, however, that the Appellate Division's remedy for the error fell

short of what he asked for to vindicate his Due Process and Sixth Amendment rights to call

witnesses and use compulsory process to that end.  He requested a new trial, but received only a

new suppression hearing.  To the extent Cherry claims that the Appellate Division committed a

remedial error, his claim is not moot.  However, because the state court denied Cherry's request

for a new trial on the merits, its decision to do so merits AEDPA deference, and Cherry may

obtain habeas relief only if the state court's decision to order a post-trial suppression hearing --

rather than a new trial -- was "contrary to, or an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d).

Cherry contends that the Appellate Division's decision contravenes the Supreme Court's decision in *Washington v. Texas*, 388 U.S. 14 (1967), stating that the Appellate Division's chosen remedy was "egregiously flawed and discordant with [the] remedial prescriptions" for compulsory process violations as spelled out in that case. Reply Br. at 5. In *Washington v. Texas*, the Supreme Court considered the Sixth Amendment right of a criminal defendant to call witnesses on his behalf *at trial*. Concluding that this right to compulsory process applies to the states by virtue of the Fourteenth Amendment's Due Process Clause, the Court found that the Texas courts had violated the right, and ordered a new trial as the remedy for the violation. Cherry contends that *Washington* mandates a new trial in the event of any erroneous refusal to allow a defendant to call witnesses in his own behalf.

In fact, *Washington* announces no such general remedial rule. Where, as in that case, the trial court commits a prejudicial constitutional error by refusing to permit the defendant to present relevant favorable evidence at trial, the only meaningful remedy is a new trial. By contrast, where, as here, the alleged error concerns a pre-trial suppression hearing, the error may be curable through a *de novo* post-trial hearing. If the trial court validly reaffirms its initial decision not to suppress the evidence after a properly conducted suppression hearing, the earlier error will prove to be harmless, and no new trial will be necessary. When reviewing the decisions of federal district courts in the Fourth Amendment context, the courts of appeals routinely follow a similar course of action. *See, e.g., United States v. Pena*, 961 F.2d 333, 340 (2d Cir. 1992) (remanding for *de novo* post-trial suppression hearing, and recognizing that the defendant's conviction would stand in the event if it was ultimately determined that the contested evidence was properly admitted).

Cherry can point to no Supreme Court decision establishing a right to a new trial where the compulsory process violation concerns a pre-trial suppression hearing.  Indeed, the Supreme Court has stated that a harmless error standard applies to compulsory process violations.  *Crane v. Kentucky*, 476 U.S. 683, 691 (1986).  The remedy chosen by the New York appellate courts in the event of a violation of the right to present evidence at a *Wade* hearing -- holding the appeal in abeyance and remanding for a post-trial *Wade* hearing to determine whether a new trial is necessary -- is not an unreasonable remedy for protecting Cherry's right to a reliable judicial determination on the issue of suggestiveness.  The decision not to award a new trial was not an unreasonable application of federal law as established by the Supreme Court.  Accordingly, to the extent it is not moot, Cherry's first claim for relief is denied on the merits.

2.      *Challenge to the Undercover Detectives' Identification Testimony*

Cherry also challenges the ultimate outcome of the post-trial hearing, contending that the New York courts erred in refusing to suppress the undercover detectives' identification testimony.   After remanding the case for the *de novo Wade* hearing, the Appellate Division denied this claim on the merits.  Deferring to the hearing court's decision crediting the officers' testimony that they had seen no pictures of Cherry prior to their identification of him, the appellate court upheld the conclusion that the lineup was not tainted.  *People v. Cherry*, 848 N.Y.S.2d 283, 284 (2d Dep't 2007).

In challenging the officers' testimony, Cherry adopts and reiterates the arguments he made unsuccessfully in his supplemental brief to the Appellate Division.  Cherry's challenge to the constitutionality of his conviction is thus an attack on the New York courts' fact-finding; he contends that the testimony of the state's law enforcement witnesses was incredible and patently tailored to meet constitutional requirements.   To succeed on this claim, Cherry must

show that the state court's contrary fact-finding rested "on an unreasonable determination of the facts in light of the evidence presented in a State court proceeding." 28 U.S.C. § 2254(d)(2). Moreover, the New York courts' credibility determination is subject to § 2254(e)(1)'s presumption of correctness, and Cherry bears the burden of rebutting that presumption by clear and convincing evidence. While a federal court can disagree with a state court's credibility determination where, on the evidence presented, it is objectively unreasonable, *see Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003), the presumption of correctness is particularly important where a court is reviewing a state court's assessment of witness credibility. *See Parsad v. Greiner*, 337 F.3d 175, 181 (2d Cir. 2003).

Cherry points to the following circumstances, arguing that they compel the conclusion that the lineup was tainted. It is undisputed that Cherry was a suspect in the case from early on May 23, 2002, when Brownlee named Cherry as a perpetrator. Later that morning, shortly after interviewing Robert about the incident at the 73rd Precinct, Cocco obtained a photograph of Cherry. Robert remained at the Precinct to pick Brownlee out of a lineup at 11:50 a.m. on the same morning, and Cocco admitted to seeing Robert shortly before the lineup. HHH. 65. Over the next few weeks, Cocco was in contact with Marquez, who spent most of the period at home recovering from his injury, and would inform Marquez when something important came up in the investigation. HH. 10-11. Later, Cocco twice saw Marquez in the hallway outside grand jury proceedings, where Marquez testified against other suspects in the case, and the two discussed the progress of the investigation. HH. 10. Additionally, in the period following the incident, Cocco disseminated photographs of Cherry on "wanted" posters that were displayed in police precincts throughout northern Brooklyn and Queens, and kept a copy to use in his investigation. Moreover, Cherry's picture appeared in the news media as a suspect in the case.

14

Marquez, at least, knew that the case was receiving media attention, though Robert claimed to have been unaware of that the case appeared in the newspapers or on television until after the lineups. HH. 9; HHH. 37-38. Given these facts, one might infer that the undercover detectives would likely have seen a photograph of Cherry before they identified him in the lineup. The detectives, however, testified that they did not.

Cherry claims that it is inconceivable that an experienced officer like Cocco would not have shown the detectives a photograph of the suspect, or use it to create a photo array to identify the unapprehended perpetrator. This course of action is not, however, inherently implausible. Brownlee had already identified Cherry as one of the shooters, thereby providing probable cause to arrest him. Moreover, from an investigative point of view, conducting a photo array might have proved counter-productive. Under New York law, photographic identifications are not generally admissible at trial. *See, e.g., People v. Jackson*, 659 N.Y.S.2d 479, 480 (2d Dep't 1997) ("a witness generally may not testify to an extrajudicial identification of a photograph of the defendant"). And conducting a photo-array carries a risk that a subsequent lineup or in-court identification may be tainted by a faulty array. Accordingly, it is plausible that Cocco would decide not to show the photograph or conduct a photo array.

In addition, Cherry argues that it is inconceivable that neither Marquez nor Robert read newspaper articles about the case or watched television coverage about the investigation into the shooting, especially given that they were not instructed to avoid media reports. But Marquez, whose injury eventually resulted in his retirement from the NYPD, testified that he did not "feel well" about the shooting, and that his family was "pretty adamant" about him not being reminded of the event. HH. 11-12. Robert, it appears, did not live in New York City, lessening his exposure to media coverage of the incident. HHH. 37. Additionally, the undercover

detectives were kept abreast of the investigation's progress by Cocco, who was a better source of information than the news media. These explanations for not seeing media coverage of the incident cannot fairly be described as incredible as a matter of law.

Further, Cherry asserts that it is impossible to believe that when Marquez saw Cocco outside the grand jury room, the two did not even discuss the names of unapprehended suspects, let alone view photographs of them. Again, however, Marquez and Cocco's testimony in this regard was not obviously false. Because, according to his own testimony, Marquez was ambivalent about talking about the case, it is not implausible that his hallway discussions with the investigating detective did not extend to the names and pictures of unapprehended suspects.

Finally, the fact that "wanted" posters appeared in police precincts does not render the detectives' testimony patently untrue. Marquez spent most of his time between the shooting and the lineup at home, while Robert, who remained an undercover detective, worked out of a secret location, not a police precinct. HHH. 41. And there is certainly nothing inherently implausible about Cocco's testimony that he removed the posters from the 73rd Precinct before Robert and Marquez arrived for the lineup.

For these reasons, I cannot say that the New York courts' decision to credit the testimony of Cocco, Robert and Marquez was unreasonable.[4] Accordingly, Cherry's challenge to the admission of the undercover detectives' identification evidence at trial is denied.

---

[4] In the alternative, respondent contends that even if the undercover detectives saw photographs of Cherry before the lineup, the admission of their identification testimony was consistent with due process because the identification evidence was independently reliable. Gov't Br. at 48-52. As respondent concedes, AEDPA's deferential standard of review would not apply to this issue because the state courts never ruled on it. *Id.* at 52 n.4.

The state is correct that, even where a pretrial identification is tainted by an impermissibly suggestive procedure, the Constitution does not bar the introduction of identification evidence where the evidence is independently reliable. *See Manson v. Brathwaite*, 432 U.S. 98, 101-14 (1977). Reliability is assessed "in light of the totality of the circumstances." *Raheem v. Kelly*, 257 F.3d 122, 135 (2d Cir. 2001). The difficulty with the state's alternative argument is that, if the detectives really did see photographs of Cherry prior to the lineup, they

3.      *The Sufficiency of the Evidence*

Cherry contends that the evidence at trial was insufficient to establish that any assault committed at 301 Sutter Avenue was "in furtherance of" his criminal possession of a weapon, as required to convict him of the felony assault offense that was charged to the jury. This claim, however, is procedurally barred as a result of Cherry's failure to preserve the argument at trial. Additionally, because there was sufficient evidence of this element of the offense, I conclude that the claim fails on its merits.

a.      *Procedural Default*

Cherry's claim that there was insufficient evidence at trial to convict him of felony assault was raised for the first time on appeal. His counsel did not mention this theory to the trial court,[5] and Cherry conceded before the Appellate Division that the argument was unpreserved. Cherry App. Div. Br. at 28. The Appellate Division concluded that the argument was "unpreserved for appellate review, and, in any event, without merit." 848 N.Y.S.2d at 284. Accordingly, the respondent contends that this claim is barred by an adequate and independent state law ground: New York's contemporaneous objection rule.

In order for a procedural bar to apply, "the state court must actually have relied on the procedural bar as an independent basis for its disposition of the case" by "clearly and expressly stat[ing] that its judgment rests on a state procedural bar." *See Harris v. Reed*, 489

---

must have been lying when they testified to the contrary at the post-trial suppression hearing. A finding that the detectives actually saw pictures of Cherry but lied on the witness stand would cast serious doubt on any independent basis they might have had for identifying Cherry. However, for the reasons stated in the text, Cherry has not demonstrated by clear and convincing evidence that the detectives' testimony was false, and it is therefore not necessary to consider respondent's alternative argument.

[5]      Langston moved for dismissal at the conclusion of the prosecution's case against him, Tr. 960-63, but under New York law, a co-defendant's objection does not preserve an argument for appellate review. *See, e.g., People v. Buckley*, 75 N.Y.2d 843, 846 (1990).

U.S. 255, 261-63 (1989). Cherry, noting that the state court also exercised its power to consider the merits of the unpreserved argument, contends that the state did not actually rely on the procedural bar. This argument, however, is squarely foreclosed by Supreme Court precedent. A state court's holding that a claim is unpreserved *and* without merit constitutes reliance on an independent state law ground. *See Harris*, 489 U.S. at 264 n.10 ("a state court need not fear reaching the merits of a federal claim in an *alternative* holding" so long as it explicitly invokes a state procedural rule as a separate basis for its decision); *cf. Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 810 (2d Cir. 2000) (claims are not procedurally barred where state court states that they are "either unpreserved for appellate review *or* without merit") (emphasis added).

New York's preservation rule, which requires a contemporaneous objection to any legal error, constitutes an independent state law ground for rejecting Cherry's claim. *See Richardson v. Greene*, 497 F.3d 212, 217 (2d Cir. 2007). Cherry makes no attempt to argue that the preservation rule is inadequate to prevent federal collateral review, and there is no indication that the state's assertion of the procedural bar was "exorbitant" as applied to this case. *See Cotto v. Herbert,* 331 F.3d 217, 239 (2d Cir. 2003). When determining whether the application of a state rule is exorbitant in a particular case, a federal habeas court may consider three guideposts: (1) "whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision"; (2) "whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented"; and (3) "whether petitioner had substantially complied with the rule . . . and, therefore, whether demanding perfect compliance with the rule would serve a legitimate government interest." *Id.* at 240 (quotation marks omitted).

Here, all three guideposts weigh against the conclusion that the application of the contemporaneous objection rule was exorbitant. First, raising an objection to the sufficiency of the evidence that any assault occurred "in furtherance of" criminal weapons possession might have altered the trial court's decision as to which charges to submit to the jury. Faced with the objection, the trial court might sensibly have submitted to the jury the alternative charge of Assault in the First Degree pursuant to New York Penal Law § 120.10(1), for which there was ample evidence at trial, rather than submitting only felony assault to the jury. Under § 120.10(1), a defendant is guilty where he causes injury to another person with a deadly weapon with the intent to cause serious injury; there is no requirement that the act have been in furtherance of another crime. Second, at the time of the trial, New York law provided clearly that a defendant was required to move for an order of dismissal at trial to preserve an objection to the sufficiency of the evidence. *See, e.g., People v. Hines*, 97 N.Y.2d 56, 62 (2001). Third, Cherry did not substantially comply with the preservation rule, failing even to move for a trial order of dismissal on any ground. *See Clark v. Perez*, 510 F.3d 382, 391 n.4 (2d Cir. 2008) ("By definition, total noncompliance cannot also be 'substantial compliance.'").

In his effort to escape the procedural default, Cherry does not seek to establish cause and prejudice, instead arguing that he is exempt from the procedural bar on the ground that a miscarriage of justice would result from a failure to hear his sufficiency claim. But Cherry falls far short of establishing that he is actually innocent of the crime for which he was convicted. As the Supreme Court stated in *Schlup*, "claims of actual innocence are rarely successful" because "[t]o be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence . . . that was not presented at trial." 513 U.S. at 324. Cherry points to some perceived inconsistencies in the prosecution's case, including the

fact that Marquez described the perpetrator he later identified as Cherry as "light-skinned" at grand jury proceedings, but admitted that Cherry was "definitely not light-skinned." HH. 18-19. Additionally, he notes that the undercover detectives stated that they saw only five other people in the hallway at the time of the shooting, whereas, if Cherry was one of the shooters, there must have been at least six people there (Cherry, Langston, Moultrie, Wyman, Brownlee, and Barber). Given the other evidence of guilt at trial, however, these arguments do not come close to establishing that "in light of all the evidence," "it is more likely than not that no reasonable juror would have convicted him." *Schlup*, 513 U.S. at 327-28 (internal quotation marks omitted).

Because the state court's rejection of Cherry's sufficiency claim rested on an adequate and independent state law ground, and because no exception to the rule of default has been established, the claim is procedurally barred.

b.      *The Merits of Cherry's Sufficiency Claim*

Regardless of whether it is procedurally barred, Cherry's contention that the jury lacked sufficient evidence to convict him of first-degree felony assault is meritless.[6] In assessing the legal sufficiency of the evidence, a reviewing court must consider the evidence in the light most favorable to the prosecution, crediting every inference that the jury might have drawn in favor of the prosecution, and may disturb the conviction only if no rational trier of fact could

---

[6]      Respondent contends that the Appellate Division's rejection of the sufficiency claim is entitled to AEDPA deference. As mentioned above, the Appellate Division held that the sufficiency claim was procedurally barred and " in any event, without merit." The state contends that, for AEDPA's purposes, the court's decision was both a decision that the claim was procedurally barred *and* a determination on the merits, and thus its determination of the merits, if it is reviewed at all, must be reviewed under the deferential AEDPA standard. In prior cases, based on my reading of the Second Circuit's opinion in *Jimenez v. Walker*, 458 F.3d 130 (2d Cir. 2006), I have concluded that in these circumstances the state court's decision on the merits is not entitled to AEDPA deference. *Ojar v. Greene*, No. 07-CV-3674 (JG), 2008 WL 428014 (E.D.N.Y. Feb. 15, 2008); *Simpkins v. People*, No. 08-CV-1086 (JG), 2008 WL 2986473 (E.D.N.Y. July 31, 2008). The respondent contends that these decisions are inconsistent with the Second Circuit's holding in *Zarvela v. Artuz*, 364 F.3d 415 (2d Cir. 2004), and asks the court to "reconsider its position on this issue." Gov't Br. at 19. Because I conclude that the sufficiency claim fails even under a *de novo* standard, it is not necessary to rule on the issue here.

have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

Cherry was convicted of first degree felony assault, after the jury found that he had caused serious physical injury to another person, "[i]n the course of and in furtherance of the commission or attempted commission of a felony or immediate flight therefrom." N.Y. Pen. Law § 120.10(4) (McKinney 2002). As an initial matter, it is worth pointing out that the evidence would have established that the assault took place in furtherance of a robbery. But Cherry was not charged with robbery, and the underlying felonies the prosecution relied on were criminal possession of a weapon in the second and third degrees. Tr. 1238-40. The court informed the jury that second degree weapon possession required the government to prove that the defendant (or an accomplice with whom he acted in concert) knowingly possessed a loaded and operable firearm with the intent to use it unlawfully against another, and that Cherry was guilty of the third degree weapons charge if he or an accomplice knowingly possessed a loaded and operable firearm outside the home or place of business of defendant and his accomplices. Tr. 1242, 1245.

New York's offense of felony assault is analogous to its offense of felony murder. *See* N.Y. Pen. Law § 125.25(3) (McKinney 2009). Both statutes create crimes of constructive malice, under which the intent necessary for an assault or murder conviction is inferred from the intent to commit the underlying felony. *People v. Spivey*, 81 N.Y.2d 356, 361 (1993); *see also People v. Berzups*, 49 N.Y.2d 417, 427 (1980) ("in felony murder the underlying felony is not so much an element of the crime as a replacement for the *mens rea* or intent necessary for common-law murder"). In the case of assault, constructive malice is ascribed to a felon who injures in the course of and in furtherance of the commission of a felony.

21

Cherry, again relying on the arguments in his brief to the Appellate Division, contends that there was no evidence that any assault was in furtherance of his criminal possession of a weapon or of his flight from committing the offense. He notes that, if guilty, he was committing the offense before any assault occurred, that the assault was unprovoked, and that the shooters left with the same guns they had possessed before the shooting began.

At first glance, it may seem artificial to describe the assault as "in furtherance of" the group's weapons possession. It is more natural to say that the act was in furtherance of their main aim, which was to rob Robert and Marquez of the money that, as gun buyers, the undercover detectives were assumed to be carrying. Nevertheless, it is plain that there was sufficient evidence to find the requisite nexus between the underlying felony and the serious injury inflicted on Marquez. The evidence at trial established that Cherry, Brownlee and Wyman stepped into the sixth floor hallway carrying firearms with the intention to open fire on the undercover detectives. In so doing, Cherry and his accomplices were committing the crimes of criminal possession of a weapon in the second and third degrees. In opening fire on the detectives, Cherry and his accomplices, while also furthering their primary aim of committing a robbery, simultaneously sought to further their criminal possession of the weapons. The assault was intended to prevent the detectives -- who might have been and in fact were armed -- from taking possession of the weapons during the robbery.

In sum, the jury could readily have inferred from the undercover officers' testimony at trial that Marquez was wounded in furtherance of the criminal possession of a weapon. In addition to being procedurally barred, Cherry's sufficiency of the evidence claim fails on the merits and provides no basis for habeas corpus relief.

## CONCLUSION

For the reasons stated above, Cherry's petition for habeas corpus is denied. As he has not made a substantial showing that he was denied a constitutional right, no certificate of appealability shall issue.

So ordered.

John Gleeson, U.S.D.J.

Dated:       August 25, 2009
                Brooklyn, New York